UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| RHONDA O'NEAL, | ) | CASE NO. C08-1696-JLR |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Rhonda O'Neal appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") which denied her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33 and 1381-83f, after a hearing before an administrative law judge ("ALJ"). For the reasons set forth below, the Court recommends that the Commissioner's decision be AFFIRMED.

I.      FACTS AND PROCEDURAL HISTORY

Plaintiff was born in January 1958, and was 50 years old on the date of the ALJ's decision. Administrative Record ("AR") 64. She has a high school education. (AR 64.)

01 Her past work experience includes employment as a receptionist, a cashier, and a technician at a

02 credit union.   (AR 69.)   Plaintiff was last gainfully employed in 2001.   (AR 3037.)

03      Plaintiff asserts that she is disabled due to renal insufficiency, bladder incontinence,

04 hypertension, muscle spasms, anemia, poor vision, anxiety, poor memory, high blood pressure,

05 mild stroke, blood transfusions, and gastroesophageal reflux disease (GERD).   (AR 50, 57,

06 68.) She asserts an onset date of January 9, 2002.   (AR 64.)

07      The Commissioner denied plaintiff's claim initially and on reconsideration.   (AR 18.)

08 Plaintiff requested a hearing, which took place on February 26, 2008.   (AR 3034-57.)   On

09 June 27, 2008, the ALJ issued a decision finding plaintiff not disabled and denied benefits

10 based on his finding that plaintiff could perform jobs existing in significant numbers in the

11 national economy.   (AR 15-31.)

12      The Appeals Council denied plaintiff's request for review (AR 5-7), making the ALJ's

13 ruling the "final decision" of the Commissioner as that term is defined by 42 U.S.C. § 405(g).

14 On November 21, 2008, plaintiff timely filed the present action challenging the

15 Commissioner's decision.   (Dkt. No. 1.)

16              II.      JURISDICTION

17      Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§

18 405(g) and 1383(c)(3).

19            III.      STANDARD OF REVIEW

20      Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of

21 social security benefits when the ALJ's findings are based on legal error or not supported by

22 substantial evidence in the record as a whole.   *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th

Cir. 2005). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id.*

The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id.* at 1076-77; see also *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## IV. DISCUSSION

The Commissioner follows a five-step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520,

01 416.920. The claimant bears the burden of proof during steps one through four. At step five,

02 the burden shifts to the Commissioner. *Id.* If a claimant is found to be disabled at any step in

03 the sequence, the inquiry ends without the need to consider subsequent steps.

04 At step one, it must be determined whether the claimant is gainfully employed. The

05 ALJ found plaintiff has not engaged in substantial gainful activity since the alleged onset date.

06 (AR 20.) At step two, it must be determined whether a claimant suffers from a severe

07 impairment. The ALJ found plaintiff has the following severe impairments: depression,

08 anxiety, hypertension, and renal insufficiency. (AR 20.) Step three asks whether a claimant's

09 impairments meet or equal a listed impairment. The ALJ found that plaintiff did not have an

10 impairment or combination of impairments that meet or equal a listed impairment. (AR 22.)

11 If a claimant's impairments do not meet or equal a listing, the Commissioner must assess

12 residual functional capacity ("RFC") and determine at step four whether the claimant has

13 demonstrated an inability to perform past relevant work. The ALJ found that plaintiff has the

14 RFC to occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds;

15 stand and/or walk for six hours in an eight hour workday and sit for six hours in an eight hour

16 workday; frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ramps and

17 stairs but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to

18 extreme cold, extreme heat, vibration, and hazards. (AR 23.) The ALJ found that plaintiff is

19 unable to perform her past relevant work. (AR 27.) If the claimant is able to perform her past

20 relevant work, she is not disabled; if the opposite is true, then the burden shifts to the

21 Commissioner at step five to show that the claimant can perform other work that exists in

22 significant numbers in the national economy, taking into consideration the claimant's RFC,

01   age, education, and work experience.   20 C.F.R. §§ 404.1520(g), 416.920(g); *Tackett v. Apfel*,

02   180 F.3d 1094, 1099-1100 (9th Cir. 1999).   The ALJ found that, according to the

03   Medical-Vocational Guidelines, there are jobs that exist in significant numbers in the national

04   economy that plaintiff could perform, and that her nonexertional limitations did not

05   significantly erode the occupational base for unskilled light work.   (AR 30.)   Accordingly, the

06   ALJ concluded that plaintiff is not disabled.   (AR 30-31.)

07         This Court's review of the ALJ's decision is limited to whether the decision is in

08   accordance with the law and the findings supported by substantial evidence in the record as a

09   whole.   *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).   Substantial evidence means

10   more than a scintilla, but less than a preponderance; it means such relevant evidence as a

11   reasonable mind might accept as adequate to support a conclusion.   *Magallanes*, 881 F.2d at

12   750.   If there is more than one rational interpretation, one of which supports the ALJ's

13   decision, the Court must uphold that decision.   *Thomas*, 278 F.3d at 954.

14         Plaintiff argues that the ALJ erred in (1) evaluating the severity of her impairments; (2)

15   evaluating whether her impairments meet or equal a listed impairment; (3) evaluating her

16   credibility; (4) evaluating lay witness testimony; (5) evaluating the medical evidence; and (6)

17   applying the Medical-Vocational Guidelines.   (Dkt. No. 20.)   She requests remand for an

18   award of benefits or, alternatively, for further administrative proceedings.   The Commissioner

19   argues that the ALJ's decision is supported by substantial evidence and should be affirmed.

20   For the reasons described below, the Court agrees with the Commissioner.

21         A.     Severity of Impairments

22         At step two, a claimant must make a threshold showing that her medically determinable

01 impairments significantly limit her ability to perform basic work activities. *See Bowen v.*

02 *Yuckert*, 482 U.S. 137, 145, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§

03 404.1520(c), 416.920(c). Basic work activities refer to "the abilities and aptitudes necessary

04 to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling,

05 reaching, carrying or handling." 20 C.F.R. § 140.1521(b); SSR 85-28. "An impairment or

06 combination of impairments can be found 'not severe' only if the evidence establishes a slight

07 abnormality that has no more than a minimal effect on an individual's ability to work."

08 *Smolen*, 80 F.3d at 1290 (internal quotation omitted). When impairments consist of no more

09 than a slight abnormality that has only a minimal effect on an individual's ability to work, a

10 finding of non-severe is appropriate. *Smolen*, 80 F.3d at 1290 (internal citations omitted).

11      The plaintiff has the burden of proving the physical or mental impairment by providing

12 medical evidence consisting of medical signs, symptoms, and laboratory findings. *See Ukolov*

13 *v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005); *see also* 20 C.F.R. §§ 404.1508, 404.1528.

14 A medical "sign" is "'an anatomical, physiological, or psychological abnormality that can be

15 shown by medically acceptable clinical and laboratory diagnosis techniques.'" *Ukolov*, at

16 1005 (quoting SSR 96-4p). A "symptom" is "'an individual's own perception or description

17 of the impact of his or her physical or mental impairment(s)." *Id.* "[U]nder no circumstances

18 may the existence of an impairment be established on the basis of symptoms alone." *Id.*

19 (citations omitted).

20      Plaintiff asserts that the ALJ erred in evaluating her headaches, abdominal pain, strokes,

21 muscle spasms, anemia, GERD, and chest pain at step two. (Dkt. No. 20 at 2.) The

22 Commissioner contends that the ALJ properly evaluated and made findings regarding

01  plaintiff's complaints.   (Dkt. No. 24 at 5.)   The Commissioner argues that "[t]he fact that

02  diagnoses have been offered in the record does not mean an impairment actually exists or that it

03  contributes to the work related limitations a claimant may have."   *Id.* at 7.   The Court finds

04  that the ALJ's determination that plaintiff's headaches, abdominal pain, strokes, muscle

05  spasms, anemia, GERD, and chest pain were not severe is supported by substantial evidence.

06          In assessing the severity of plaintiff's impairments, the ALJ properly considered the

07  medical evidence, and found that plaintiff suffered from the following severe impairments:

08  depression, anxiety, hypertension, and renal insufficiency.   (AR 20-22.)   The ALJ also

09  considered the following impairments identified by plaintiff – headaches, stroke, chest pain,

10  epigastric pain, hypokalemia, anemia, menorrhagia, abnormal vaginal bleeding, muscle spasms

11  – but found no objective medical evidence to support these impairments.   *Id.*

12          The ALJ noted that plaintiff seeks frequent treatment for headaches, but that there is no

13  objective medical evidence in the record to support this impairment.   (AR 21.)   Rather, the

14  ALJ found that plaintiff frequently sought treatment when she was in no acute distress (AR 285,

15  321, 341, 343, 350, 366, 2375), CT scans have shown no abnormalities (AR 304, 340, 362,

16  1236, 2374), and numerous treating physicians have suspected drug seeking behavior as

17  plaintiff would receive narcotic medication in the emergency room when complaining of

18  headaches (AR 192, 220, 253, 314, 390, 395, 430, 550, 942, 1045, 2332, 2376, 2378, 2585,

19  2680).   *Id.*   Accordingly, the ALJ committed no legal error in finding plaintiff's headaches

20  non-severe at step two.

21          The ALJ also considered plaintiff's alleged "history of stroke," but likewise found no

22  objective medical evidence to establish this impairment.   (AR 21.)   Rather, a CT scan, MRI,

01 and neurological exam were all normal.   (AR 21, citing AR 681, 716.)   Moreover, plaintiff's

02 treating neurologists at the time felt that a stroke was "unlikely" (AR 681), and that plaintiff's

03 "history of stroke should be viewed with skepticism" (AR 716).   The ALJ did not err in finding

04 no medically determinable impairment, as there is no medical evidence in the record to confirm

05 that plaintiff ever suffered a stroke.

06       Similarly, the plaintiff complained of chest pain, but the ALJ found no objective

07 medical evidence of any cardiac impairment.   (AR 21.)   The ALJ noted that a March 2005

08 echocardiogram showed no focal wall motion abnormalities, concentric left ventricular

09 hypertrophy, and an ejection fraction of 70%.   *Id.* (citing AR 629).   In addition, she

10 underwent a myocardial perfusion scan with no scintigraphic evidence of myocardial ischemia.

11 *Id.*   Plaintiff was discharged with no evidence or diagnosis of acute coronary syndrome or

12 coronary artery disease.   *Id.*   An exercise treadmill test and echocardiogram on September 17,

13 2005, showed no ECG or echocardiographic evidence of ischemia.   *Id.* (citing AR 2053).   A

14 left heart catheterization and coronary angiography showed no significant coronary artery

15 disease and normal left ventricular filling pressures.   *Id.* (citing AR 2051).   Although plaintiff

16 was diagnosed with congestive heart failure secondary to diastolic dysfunction on October 31,

17 2005, there was no objective foundation for this diagnosis.   *Id.* (citing AR 1968).   "An echo

18 exam on January 23, 2006, showed borderline left atrial enlargement and no significant

19 valvular stenosis or regurgitation."   *Id.* (citing AR 1725).   On September 6, 2006, plaintiff

20 was found to have stress induced chest pain.   *Id.* (citing AR 1474).   On August 25, 2007,

21 plaintiff underwent a stress test which showed no scintigraphic findings to suggest either acute

22 ischemia or old infarct, no wall motion abnormalities, and the ejection fraction was within

01 normal range. *Id.* (citing AR 2416). The plaintiff was subsequently diagnosed with chest

02 pain secondary to her anxiety, not cardiac. *Id.* (citing AR 2430, 2394). Evidence of a medical

03 provider's efforts to evaluate and treat a claimant is not sufficient to establish an impairment.

04 *See Ukolov*, 420 F.3d at 1005. Plaintiff's medical records do not support a finding of

05 impairment.

06      The ALJ also noted that other complaints and diagnoses appear in the treatment records,

07 including epigastric pain (AR 933, 2447, 2452), hypokalemia (AR 2909), anemia (AR 2523),

08 menorrhagia (AR 207), and abnormal vaginal bleeding (AR 2151, 2157), but that "there is no

09 objective medical evidence to show that these impairments are more than transient or that they

10 cause significant vocational limitations." (AR 22.) The ALJ properly found no evidence in

11 the record showing that these conditions limited her ability to do basic work activities.

12 *Bowen*, 482 U.S. at 141.

13      Finally, the ALJ noted that "while plaintiff has complained of muscle spasms there is no

14 medically determinable impairment associated with this symptom." (AR 22.) As indicated

15 above, evidence of plaintiff's own perceptions or description of the effects of her alleged

16 impairments, without more, cannot establish the existence of an impairment. *See Ukolov*, 420

17 F.3d at 1005. "'[R]egardless of how many symptoms an individual alleges, or how genuine

18 the individual's complaints may appear to be, the existence of a medically determinable

19 physical or mental impairment cannot be established in the absence of objective medical

20 abnormalities . . .'" *Id.* (quoting SSR 96-4p). The ALJ properly evaluated plaintiff's severe

21 impairments.

22 / / /

B.    Listed Impairments

Step three of the sequential evaluation process requires the ALJ to determine whether plaintiff's impairments meet or equal any of the listed impairments described in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d).   The listings describe specific impairments in each of the body's major systems that are considered "severe enough to prevent a person from doing most gainful activity."   *See* 20 C.F.R. §§ 404.1525, 416.925(a).   Severe impairments must be "permanent or expected to result in death," or must last or be expected to last for a continuous period of at least twelve months.   20 C.F.R. §§ 404.1525(a), 416.925(a).   The ALJ's analysis at step three must rely only on medical evidence and not rely on age, education or work experience.   20 C.F.R. §§ 404.1520(d), 416.920(d); *see also Bates v. Barnhart*, 222 F. Supp. 2d 1252, 1258 (D. Kan.   2002).   To be found disabled at step three, plaintiff must prove that he or she meets or equals each of the characteristics of a listed impairment.   20 C.F.R. §§ 404.1525(a), 416.925(a); *See Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).   When a plaintiff suffers from multiple impairments and none of them individually satisfies a listing, an ALJ must determine "'whether the combination of [the] impairments is medically equal to any listed impairment.'"   *See Lewis*, 236 F.3d at 514 (quoting 20 C.F.R. § 404.1526(a)).

Here, the ALJ found plaintiff's impairments, either alone or in combination, did not meet or equal any Listing.   (AR 22-23.)   Plaintiff argues that the ALJ erred by finding that her renal insufficiency did not meet Listing 6.02 for Impairment of Renal Function at step 2.   (Dkt. No. 20 at 20.)   Section 6.02 states as follows:

6.02 Impairment of renal function, due to any chronic renal disease that has lasted or can be expected to last for a continuous period of at least 12 months. With:

01       A.        Chronic hemodialysis or peritoneal dialysis . . .

02       OR

03       B.        Kidney transplantation.  . . .

04       OR

05       C.        Persistent elevation of serum creatinine to 4 mg per deciliter (dL)(100

06       ml) or greater or reduction of creatinine clearance to 20 ml per minute or less, over at least 3 months, with one of the following:

07       1.  Renal osteodystrophy . . .

08       2.  Persistent motor or sensory neuropathy . . . or

09       3.  Persistent fluid overload syndrome with:

10           a.  Diastolic hypertension greater than or equal to diastolic blood pressure of 110 mmHg; or

11

12           b.  Persistent signs of vascular congestion despite prescribed therapy . . .

13 20 C.F.R Pt. 404, Subpt. P, App. 1, § 6.02.

14       Plaintiff asserts that her persistent elevation of serum creatinine with persistent fluid

15 overload syndrome and diastolic hypertension satisfied the Listing's requirement under

16 6.02(C)(3)(a), citing to pages in the Administrative Record.  (Dkt. No. 20 at 20-21, citing AR

17 1089-98, 1140-56.)  As indicated above, 6.02(C)(3)(a) requires "[p]ersistent elevation of

18 serum creatinine to 4 mg . . . or greater . . . over at least three months," and "[p]ersistent fluid

19 overload syndrome with . . . [d]iastolic hypertension greater than or equal to diastolic blood

20 pressure of 110 mmHg."  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.02.

21       The Commissioner argues that plaintiff's serum creatinine levels never rose to the

22 Listing's elevation requirement of 4 mg or greater.  (Dkt. No. 24 at 8.)  Rather, the plaintiff's

01  lab results showed in April 2004 "stable creatinine of 1.4" (AR 1235); in December 2004

02  "creatinine has remained stable at 1.5" (AR 1222); in January 2006, "last creatinine was back in

03  the normal range" (AR 1192); in October 2007, "kidney function is stable" AR 1095.   (See

04  also AR 1089-98, 1140-56.)[1]    In addition, state agency medical consultant Jeff Merrill, M.D.,

05  noted in August 2005 that plaintiff has "mild chronic renal failure" and that creatinine was

06  between 1.4 and 1.6.   (AR 187.)   Medical expert Robert Nielsen, M.D., also testified that

07  plaintiff had only "a modest degree of renal insufficiency" (AR 3050), that her creatinine was

08  "relatively stable between 1.4 and 1.7," and therefore he did not consider any of the Listings

09  because he "didn't think she met anything."   (AR 3052.)   The Court agrees with the

10  Commissioner that the evidence does not support plaintiff's assertion that she is disabled based

11  on renal insufficiency under Listing 6.02(C)(3)(a).[2]

12      Plaintiff also argues that the ALJ erred by finding that her hypertension did not meet

13  Listing 4.03 for Hypertensive Cardiovascular Disease.   (Dkt. No. 20 at 21.)   Former Listing

14  4.03 states as follows:

15      4.03  **Hypertensive cardiovascular disease.**   Evaluate under 4.02 [chronic
        heart failure] or 4.04 [ischemic heart disease], or under the criteria for the

16  _____

17      1   The Commissioner also argues that the treatment notes cited by plaintiff in her opening brief show that
    her diastolic blood pressure was consistently below 110 mmHg.   (AR 1141, 1151, 1154, 1166, 1169, 1172, 1175,

18  1178, 1182, 1184, 1186, 1189, 1192, 1195, 1198, 1230-35.)   Plaintiff responds in her reply brief that her diastolic
    blood "often rose above 110," citing numerous pages in the medical record. (Dkt. 25 at 6.)   However, plaintiff still
    fails to meet her burden of showing that she meets Listing 6.02(C), as she concedes that her serum creatinine level

19  never rolse to the Listing level. *Id.*

20      2  Despite having argued in her opening brief that she meets Listing 6.02(C) based on persistent elevation
    of serum creatinine, plaintiff argues in her reply brief that she may meet Listing 6.02(C) based on a reduction of
    creatinine clearance. (Dkt. 20 at 20; Dkt. 25 at 6.)   To meet a listed impairment, plaintiff has the burden of

21  showing that she meets each and every element described in the Listing.   See 20 C.F.R. § 404.1525(d); *see also*
    *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S. Ct. 885, 107 L. Ed 2d 967 (1990).   Plaintiff has pointed to no
    evidence in the record that shows she suffered from a reduction of creatinine clearance to 20 ml per minute or less

22  over at least three months.   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.02(C).   Thus, plaintiff twice failed to meet her
    burden.

01      affected body system (2.02 through 2.04 [vision], 6.02 [renal function], or

     11.04A or B [central nervous system])."

02

03 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.03.   Under former Section 4.00(C), in order to meet

04 Listing 4.03, plaintiff must demonstrate that her hypertension has end organ damage.   *See* 20

05 C.F.R. Part 404, Subpart P, App. 1 § 4.00(C)(1991)("Hypertensive vascular diseases does not

06 result in severe impairment unless it causes severe damage to one or more of four end organs;

07 heart, brain, kidneys, or eyes.   (retinae).   The presence of such damage must be established

08 by appropriate abnormal physical signs and laboratory findings specified in 4.02 or 4.04, or for

09 the body system involved.").   However, the ALJ found that plaintiff's "hypertension does not

10 meet or medically [equal] a listing because the [plaintiff] does not have any end organ damage."

11 (AR 22.)   The ALJ also discussed plaintiff's hypertension and cardiac difficulties in his

12 analysis under Steps 2 and 4.   Relying on medical reports from plaintiff's treating physicians,

13 the ALJ found at step 2 no evidence of cardiac damage or impairment.   (AR 21, 25-26.)

14 Plaintiff argues that she meets listing 4.02, citing to testing results conducted on September 17,

15 2005.   (Dkt. No. 20 at 21.)   However, as the ALJ noted, "[a]n exercise treadmill test and

16 echocardiogram were conducted on September 17, 2005 which showed no obvious ECG or

17 echocardiogram evidence of ischemia (27F-656).   A left heart catheterization and coronary

18 angiography were also conducted which showed no significant coronary artery disease and

19 normal left ventricular filling pressures (27F-654)."   (AR 21, citing AR 2051, 2053.)

20      Again, plaintiff bears the burden of proving that she meets or equals the criteria of a

21 listed impairment.   *See Lewis*, 236 F.3d at 514 (holding that an ALJ's failure to consider

22 equivalence is not error when the plaintiff did not offer any theory, plausible or otherwise, as to

01  how an impairment(s) equaled a listed impairment).   The three pages of medical records

02  identified by plaintiff do not establish that she meets the criteria under Listing 4.03.   Indeed,

03  plaintiff's medical results do not even support her argument.   The Court finds no error in the

04  ALJ's analysis.

05      Furthermore, the Court rejects plaintiff's assertion that the ALJ should have further

06  developed the record through expert medical testimony regarding whether her impairments met

07  or equaled a listing.   As the claimant, plaintiff bears the burden to undertake such a

08  comparison.   *See Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001)(holding that an ALJ's

09  failure to consider equivalence is not error when the plaintiff did not offer any theory, plausible

10  or otherwise, as to how an impairment(s) equaled a listed impairment).   The ALJ must only

11  develop the record if the evidence is ambiguous or "the record is inadequate to allow for proper

12  evaluation of the evidence."   *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).   The

13  evidence here was neither ambiguous nor inadequate.   The ALJ properly found that plaintiff

14  did not have an impairment or combination of impairments that meets or medically equals

15  Listing 4.02, 4.03, or 4.04.

16      Plaintiff next argues that she qualifies under mental impairment Listings 12.04

17  (affective disorders) and 12.06 (anxiety-related disorders) based on her depression and anxiety.

18  (Dkt. No. 20 at 21.)   Each of these listings requires, among other criteria, that the plaintiff's

19  mental impairments result in at least two of the following problems: (1) marked restriction of

20  activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked

21  difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of

22  decomposition, each of extended duration.   *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§

01 12.04(B) and 12.06(B) ("B criteria").

02　　　The ALJ found that plaintiff has only moderate restriction of activities of daily living,

03 noting that plaintiff has the ability to engage in a wide range of activities, such as traveling to

04 the Bahamas, and caring for her daughter's children.   (AR 22-23, citing AR 1345, 1349, 1370,

05 1371.) The ALJ also noted that plaintiff is able to perform some household chores, have her hair

06 and nails done, engage in social activities, and enjoy watching television and movies.   (AR at

07 24.)   Relying on the state agency medical consultant Gary Nelson, Ph.D. (AR 154-71), the ALJ

08 concluded that plaintiff has moderate restriction of activities of daily living; no difficulties in

09 maintaining social functioning, moderate difficulties in maintaining concentration, persistence,

10 or pace, and no episodes of decompensation.   (AR 22-23.)   The ALJ thus concluded that

11 because plaintiff's mental impairments do not cause at least two "marked" limitations or one

12 "marked" limitation and "repeated" episodes of decompensation, plaintiff's mental

13 impairments failed to satisfy the B criteria.   The ALJ also concluded that plaintiff's mental

14 impairments failed to satisfy the C criteria.   (AR 23.)   See 20 C.F.R. Pt. 404, Subpt. P, App. 1,

15 §§ 12.04(C) and 12.06(C) ("C criteria").

16　　　Plaintiff contends that her depression and anxiety satisfy the B criteria, citing to a

17 November 15, 2007, questionnaire that was completed by mental health services provider John

18 Cockfield, B.A., who opined that plaintiff had marked restrictions of activities of daily living,

19 marked difficulties in maintaining social functioning, marked difficulties in maintaining

20 concentration, persistence, and pace, and no episodes of decompensation.   (Dkt. No. 20 at 21,

21 citing AR 2484-96.)   Plaintiff claims that "[e]ven though he is not a physician, Mr. Cockfield's

22 opinion about Plaintiff's functional limitations is entitled to some weight."   (Dkt. No. 25 at 8.)

01      The ALJ gave "no weight" to Mr. Cockfield's "unexplained opinion," noting that Mr.

02 Cockfield's opinion "is not consistent with the claimant's wide range of activities, and that he is

03 neither a qualified psychologist nor psychiatrist." (AR 26-27.) Acceptable medical sources

04 include licensed psychiatrists and licensed psychologists, but not mental health service

05 providers. *See* 20 C.F.R. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a).

06      In order to determine whether a claimant is disabled, an ALJ may consider lay-witness

07 sources, such as testimony by nurse-practitioners, physicians' assistants, and counselors. *See*

08 20 C.F.R. § 404.1513(d). Such testimony regarding a claimant's symptoms or how an

09 impairment affects her ability to work is competent evidence and cannot be disregarded without

10 comment. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). This is particularly true

11 for "non-medical" sources such as nurses and counselors. *See* SSR 06-03p (noting that

12 because such persons "have increasingly assumed a greater percentage of the treatment and

13 evaluation functions previously handled primarily by physicians and psychologists," their

14 opinions "should be evaluated on key issues such as impairment severity and functional effects,

15 along with the other relevant evidence in the file."). If an ALJ chooses to discount testimony

16 of a lay witness, he must provide "reasons that are germane to each witness," and may not

17 simply categorically discredit the testimony. *Id.* at 919.

18      Here, the ALJ provided germane reasons for rejecting the lay opinion of Mr. Cockfield

19 regarding plaintiff's mental impairments. The ALJ noted that the level of limitations

20 identified by Mr. Cockfield were not consistent with plaintiff's wide range of activities. (AR

21 26-27.) In addition, the ALJ noted that Mr. Cockfield was a lay witness and not an acceptable

22 medical source, and was therefore accorded no weight pursuant to SSR 06-03p. (AR 27.)

01 The ALJ properly accorded greater weight to the opinion of state agency medical consultant

02 Gary Nelson, Ph.D., supra (AR 154-71), who determined that plaintiff's mental impairments

03 did not meet a listing.   (AR 23, 27.)   In addition, the ALJ gave significant weight to examining

04 psychologist George Ankuta, Ph.D., (AR 1064-66), who opined that plaintiff had a Global

05 Assessment of Functioning ("GAF") of 54, that she might be able to work with special

06 supervision, that her attention and concentration were good, and that she could maintain

07 appropriate social interactions at work.   (AR at 26.)   An ALJ may properly accord less weight

08 to opinions from "other sources" than to opinions from acceptable medical sources.   *See*

09 *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996).   Additionally, an ALJ may reject lay

10 testimony if it is inconsistent with a claimant's activities or the objective evidence in the record.

11 *See Bayliss*, 427 F.3d at 1218.   The ALJ's decision to reject Mr. Cockfield's opinion was

12 proper.   The ALJ's finding that plaintiff's depression and anxiety did not meet or equal a listed

13 impairment is supported by substantial evidence.

14 C.      Credibility

15        Credibility determinations are particularly within the province of the ALJ.   *Andrews*,

16 53 F.3d at 1043.   Nevertheless, when an ALJ discredits a claimant's testimony, he must

17 articulate specific and adequate reasons for doing so.   *Greger v. Barnhart*, 464 F.3d 968, 972

18 (9th Cir. 2006).   The determination of whether to accept a claimant's subjective symptom

19 testimony requires a two-step analysis.   20 C.F.R. § 404.1529, 416.929; *Smolen*, 80 F.3d at

20 1281; Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, *2-3.   First, the ALJ must

21 determine whether there is a medically determinable impairment that reasonably could be

22 expected to cause the claimant's symptoms.   20 C.F.R. § 404.1529(b), 416.929(b); *Smolen*, 80

01   F.3d at 1281-82; SSR 96-7p, 1996 WL 374186, *2-3.   Once a claimant produces medical

02   evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to

03   the severity of symptoms solely because they are unsupported by objective medical evidence.

04   *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991) (en banc).   Absent affirmative evidence

05   that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for

06   rejecting the claimant's testimony.   *Smolen*, 80 F.3d at 1284; *Reddick v. Chater*, 157 F.3d 715,

07   722 (9th Cir. 1988).

08        An ALJ is not "required to believe every allegation of disabling pain" or other

09   non-exertional impairment.   *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).   When

10   evaluating a claimant's credibility, however, the ALJ "must specifically identify what

11   testimony is not credible and what evidence undermines the claimant's complaints."   *Greger*,

12   464 F.3d at 972 (internal quotation omitted).   General findings are insufficient.   *Smolen*, 80

13   F.3d at 1284; *Reddick*, 157 F.3d at 722.   The ALJ may consider "ordinary techniques of

14   credibility evaluation," including the claimant's reputation for truthfulness, inconsistencies in

15   testimony or between her testimony and conduct, daily activities, work record, and the

16   testimony from physicians and third parties concerning the nature, severity, and effect of the

17   symptoms of which she complains.   *Smolen*, 80 F.3d at 1284.

18        Here, there are no allegations that plaintiff was malingering, therefore the ALJ was

19   required to provide clear and convincing reasons for discounting her testimony.   *Reddick*, 157

20   F.3d at 722.   The ALJ found that plaintiff's "medically determinable impairments could

21   reasonably be expected to produce some of the alleged symptoms," but concluded that

22   plaintiff's "statements concerning the intensity, persistence and limiting effects of these

01 symptoms are not credible."  (AR 24.)   In making this determination, the ALJ considered all

02 of the symptoms alleged by plaintiff that could "reasonably be accepted as consistent" with the

03 objective medical evidence and other evidence presented in the record, based on the

04 requirements of 20 C.F.R. § 404.1529 and 416.929 and SSRs 96-4p and 96-7p.   (AR 23.)

05       The ALJ found that the plaintiff's testimony about her limitations was not entirely

06 credible.   In doing so, the ALJ found that plaintiff's reporting was inconsistent with other

07 evidence in the record, she exhibited drug seeking behavior, and she has not followed medical

08 advice or taken medication as prescribed. (AR 24-25.)   Specifically, the ALJ noted that

09 plaintiff had planned a vacation to the Bahamas, where she had enjoyed "relaxing and bonding"

10 with her sisters.   (AR 24, 1349, 1345.)   In addition, plaintiff reported that she had attended a

11 Department of Vocational Rehabilitation class, and had spent an hour having her hair and nails

12 done.   (AR 24, 1384.)   She also reported that she had been caring for her daughter's children

13 while her daughter was incarcerated.   (AR 24, 1370-71.)   Plaintiff also engages in social

14 activities and enjoys watching television and movies.   (AR 24, 109.)   The ALJ is permitted to

15 draw an adverse inference as to the plaintiff's credibility when the claimant is able to engage in

16 daily activities inconsistent with an alleged impairment.   *Burch*, 400 F.3d at 679.   The ALJ

17 did not err by finding that the plaintiff's daily activities were inconsistent with the impairments

18 alleged, thereby making an appropriate adverse credibility determination.

19       In addition, the ALJ found that plaintiff's credibility was undermined by her drug

20 seeking behavior.   (AR 24-25.)   The ALJ found that plaintiff "has sought frequent treatment

21 for headaches in the emergency room and obtained narcotic drugs," and that her "[d]rug

22 seeking behavior has been noted and some physicians have refused to continue prescribing

01 narcotic medications to the claimant." (AR 24, 187, 192, 195, 220, 227, 228, 253, 283, 290,

02 314, 337, 390, 393, 395, 430, 550, 799, 942, 944, 946, 956, 1045, 1570, 1628, 2211, 2332,

03 2376, 2378, 2585, 2680, 2688.)   In April 2006, a treating physician noted that plaintiff had

04 made 80 visits to the emergency room since 2000, and that 30 of those visits had been in the last

05 year.   (AR 1570.)   An ALJ may consider drug seeking behavior in discounting a claimant's

06 credibility.   *See Edlund v. Massanari*, 253 F.3d 1152, 1157-58 (9th Cir. 2001); *see also*

07 *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003)(*citing Anderson v. Shalala*, 51 F.3d

08 777, 780 (8th Cir. 1995)(observing that claimant's "drug seeking behavior further discredits her

09 allegations of disabling pain.")).

10          Further, the ALJ observed that plaintiff has failed to follow medical advice or take

11 medication as prescribed, citing to numerous medical reports in the record.   (AR 25; AR 762

12 "poor medical compliance;" AR 799 "I suspect that she may not be taking her medications

13 regularly.   When she goes to the emergency room, it seems that getting her regular medications

14 relieves her hypertension fairly promptly;" AR 829 "she is not taking her clonodine;" AR 1198

15 "BP is running higher since stopped taking the minoxidil;" AR 741 "admitted to discontinuing

16 multiple" medications; AR 944 "[i]t is possible that she is not taking her medication regularly;"

17 AR 1570 "the patient does not follow up;" AR 2211 "has not been terribly cooperative with

18 care;" AR 2524 "[y]ou have missed three appointments with me in the last three weeks, and this

19 is unacceptable;" AR 2500 "[t]he patient has once again denied any noncompliance with her

20 medications; however, her recent hospitalization during which she became quite hypotensive

21 when on her prescribed medication regimen would suggest otherwise.")

22          A claimant's "statements may be less credible if . . . the medical reports or records show

01 that an individual is not following the treatment as prescribed and there are not good reasons for

02 this failure."    SSR 96-7p. *7; *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001,

03 1003 (9th Cir. 2006)(holding that "[i]mpairments that can be controlled effectively with

04 medication are not disabling for the purpose of determining eligibility for SSI benefits.").

05 "'[U]nexplained, or inadequately explained, failure to seek treatment . . . can cast doubt on the

06 sincerity of [a] claimant's pain testimony.'"    *Regennitter v. Comm'r Soc. Sec. Admin.*, 166

07 F.3d 1294, 1297 (9th Cir. 1999)(*quoting Fair*, 885 F.2d at 603).    While plaintiff denied

08 non-compliance with her medication, her treating physicians have suggested otherwise. *See*

09 *Fair*, 885 F.2d at 603 (holding that non-compliance with prescribed treatment is proper

10 evidence relating the credibility of the claimant).

11        The ALJ articulated several reasons for discounting plaintiff's credibility, including her

12 inconsistent reporting, drug seeking behavior, and failure to follow medical advice.    It is clear

13 that the ALJ properly evaluated plaintiff's medical record as a whole in accordance with SSR

14 96-7p when making his credibility finding.

15 D.    Lay Witness Testimony

16        "In determining whether a claimant is disabled, an ALJ must consider lay witness

17 testimony concerning a claimant's ability to work."    *Stout v. Comm'r*, 454 F.3d 1050, 1053

18 (9th Cir. 2006).    Lay witness testimony as to a claimant's symptoms or how an impairment

19 affects ability to work is competent evidence, 20 C.F.R. § 404.1513(e), *Sprague v. Bowen*, 812

20 F.2d 1226, 1232 (9th Cir.1987), and therefore cannot be disregarded without comment.

21 *Dodrill*, 12 F.3d at 918-19.    If an ALJ wishes to discount the testimony of a lay witness, he

22 must provide reasons germane to each witness and may not simply categorically discredit the

01  testimony.  *Id.* at 919.

02      Plaintiff contends that the ALJ failed to properly consider the testimony of plaintiff's

03  daughter Shauntae Chinn.  Dkt. No. 20 at 22.  On April 17, 2005, Ms. Chinn completed a third

04  party function report in which she opined that plaintiff was unable to cook or perform

05  housework, and that she experienced side effects from her medication which made her drowsy.

06  AR 24, 96-104.  She also stated that plaintiff had a wide range of physical and mental

07  limitations due to medication, muscle spasms, and lack of attention, but that she engaged in

08  social activities and enjoyed watching television and movies.  *Id.*  The ALJ found Ms.

09  Chinn's reporting inconsistent with plaintiff's wide range of physical activities, which, as

10  indicated above, included engaging in social activities with her friends, enjoying watching

11  television and movies, vacationing with her family, attending a Department of Vocational

12  Rehabilitation class, having her hair and nails done, and caring for her daughter's children

13  while her daughter was incarcerated.  AR 24.  The ALJ provided germane reasons for

14  discounting the lay statements of plaintiff's daughter.

15  E.    Medical Opinion

16      As a matter of law, more weight is given to a treating physician's opinion than to that of

17  a non-treating physician because a treating physician "is employed to cure and has a greater

18  opportunity to know and observe the patient as an individual."  *Magallanes*, 881 F.2d at 751;

19  20 C.F.R. § 404.1527(d)(1)-(2).  "Likewise, greater weight is accorded to the opinion of an

20  examining physician than a non examining physician."  *Andrews*, 53 F.3d at 1041.  However,

21  under certain circumstances, a treating or examining physician's opinion can be rejected,

22  whether or not that opinion is contradicted by other medical evidence of record.  *Magallanes*,

01 881 F.2d at 751.  An ALJ must give clear and convincing reasons for rejecting a treating or

02 examining physician's opinion if that opinion is not contradicted by other evidence, and

03 specific and legitimate reasons if it is.  *Reddick*, 157 F.3d at 725.  "This can be done by setting

04 out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

05 interpretation thereof, and making findings."  *Id.* (*citing Magallanes*, 881 F.2d at 751).  The

06 ALJ must do more than merely state his conclusions.  "He must set forth his own

07 interpretations and explain why they, rather than the doctors', are correct."  *Id.* (*citing Embrey*

08 *v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)).  Such conclusions must at all times be

09 supported by substantial evidence.  *Id.*

10          "Where the Commissioner fails to provide adequate reasons for rejecting the opinion of

11 a treating or examining physician, [the Court credits] that opinion as 'a matter of law.'"

12 *Lester*, 81 F.3d at 830-34 (finding that, if doctors' opinions and plaintiff's testimony were

13 credited as true, plaintiff's condition met a listing) (*quoting Hammock v. Bowen*, 879 F.2d 498,

14 502 (9th Cir. 1989)).  Crediting an opinion as a matter of law is appropriate when, taking that

15 opinion as true, the evidence supports a finding of disability.  *See Smolen*, 80 F.3d at 1292

16 (ALJ's reasoning for rejecting subjective symptom testimony, physicians' opinions, and lay

17 testimony legally insufficient; finding record fully developed and disability finding clearly

18 required).

19          However, courts retain flexibility in applying this crediting as true theory.  *Connett v.*

20 *Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (remanding for further determinations where there

21 were insufficient findings as to whether plaintiff's testimony should be credited as true).  As

22 stated by one district court:  "In some cases, automatic reversal would bestow a benefits

01  windfall upon an undeserving, able claimant." *Barbato v. Comm'r of Soc. Sec. Admin.*, 923 F.

02  Supp. 1273, 1278 (C.D. Cal. 1996) (remanding for further proceedings where the ALJ made a

03  good faith error, in that some of his stated reasons for rejecting a physician's opinion were

04  legally insufficient).

05    *1. Pamila R. Keech, M.D.*

06    Plaintiff asserts that the ALJ improperly rejected the opinion of treating nephrologist

07  Pamila R. Keech, M.D., who has treated plaintiff for severe hypertension and chronic kidney

08  disease secondary to hypertension since January 2003.  (AR 1089-98, 1140-1256.)  On

09  October 25, 2007, Dr. Keech completed a questionnaire provided by plaintiff's attorney

10  regarding plaintiff's physical impairments.  (AR 1089-98.)  She noted that plaintiff's blood

11  pressure and creatinine levels were high, and that increased stress causes plaintiff's blood

12  pressure to be uncontrollable.  (AR 1089, 1091.)  Dr. Keech noted that plaintiff has no side

13  effects or physical limitations from the medication she prescribes, and that plaintiff has a

14  condition that could produce pain but that plaintiff is seen by other physicians.  (AR 1090.)

15  She declined to provide any functional limitations. (AR 1091-93.)

16    On March 26, 2008, Dr. Keech prepared a letter on plaintiff's behalf regarding her

17  treatment. (AR 2497.)  She noted that plaintiff's conditions are difficult to control, but that her

18  blood pressure medications are effective unless her stress level is high.  *Id.*  Dr. Keech again

19  provided no opinion regarding plaintiff's functional limitations.

20    Contrary to plaintiff's contention, the ALJ did not reject the opinion of Dr. Keech.

21  Rather, the ALJ stated that he considered Dr. Keech's reporting but noted that Dr. Keech did

22  not provide any opinion regarding plaintiff's functional limitations in either her 2007

01  questionnaire or her 2008 letter. (AR 25.)   The ALJ accepted Dr. Keech's opinions, to the

02  extent that she gave any, but noted that "the record is clear" that plaintiff has not been compliant

03  with Dr. Keech's treatment recommendations, negating Dr. Keech's opinion regarding the

04  severity of plaintiff's conditions.   *Id.* (citing AR 762, treating physician noted, "It is felt that

05  the patient can have adequate blood pressure control if she takes her medications and

06  hydralazine should be considered by her outpatient physicians.   Dr. Keech stated the patient

07  would unlikely take a medication four times a day as she has poor medical compliance."); (AR

08  741, treating physician noted, "The patient continues to complain of headaches and

09  hypertension, with blood pressure elevated to 230/122 today. . . . I have again reinforced the

10  importance of continuing her antihypertensive medications.   Given the fact that she has

11  admitted to discontinuing multiple of her other medications, I am skeptical whether she is

12  compliant with her hypertensives at this time."); (AR 944, treating physician noted, "I do not

13  know why her blood pressure remains elevated despite multiple medications at maximum

14  doses.   It is possible that she is not taking her medication regularly"); (AR 2500, treating

15  physician noted, "Labile hypertension.   The patient has once again denied any noncompliance

16  with her medications; however, her recent hospitalization during which she became quite

17  hypotensive when on her prescribed medication regimen would suggest otherwise. I will

18  discuss this episode with her nephrologist, Dr. 'Keech.'   Ms. O'Neal-Chinn's medication

19  regimen has now been changed such that at least while in the hospital her systolic blood

20  pressure was well-controlled.)

21          The ALJ also noted that on February 26, 2007, plaintiff's primary care physician Tracy

22  Murray, M.D., cleared plaintiff to have procedures for anal stenosis and dysfunctional uterine

01 bleeding, noting that plaintiff's hypertension and chronic kidney disease appeared to be under

02 good control.  (AR 25, 2336.)   Dr. Murray also noted that plaintiff has normal lung function

03 and that a study done on September 15, 2006, showed normal myocardial perfusion without

04 evidence of inducible ischemia, and normal left ventricular systolic function.   (AR 2336.)

05     As noted by the ALJ, Dr. Keech did not assess any specific limitations.   Where

06 conflicting medical evidence is presented, the ALJ may properly resolve the conflict.   *See*

07 *Richardson*, 402 U.S. at 399.   The ALJ sufficiently referenced the conflicting evidence he

08 relied upon.   The Court assigns no error in this regard.

09     2.     *Kristina Rashid, M.D; Anne Smith, M.D.; Heidi Powell, M.D.; and*
           *Tracy Murray, M.D.*

10

11     Plaintiff claims that the ALJ improperly rejected the opinions of her treating physicians

12 Kristina Rashid, M.D. (AR 983-86); Anne Smith, M.D. (AR 978-81); Heidi Powell, M.D. (AR

13 1076-79); and Tracy Murray, M.D. (AR 1080-84); contained in their Department of Social and

14 Health Services ("DSHS") Physical Evaluations.   (Dkt. No. 20 at 4.)   The Commissioner

15 responds that the ALJ properly gave "little weight" to these opinions.   (Dkt. No. 24 at 15.)

16     Dr. Rashid was plaintiff's primary care physician for four months from October 2003 to

17 February 2004.   (AR 936-66.)   On November 10, 2003, Dr. Rashid completed a DSHS

18 Physical Evaluation in which she opined that plaintiff's severe hypertension and chronic renal

19 insufficiency would likely limit plaintiff's ability to do any kind of work with physical exertion.

20 (AR 986.)   In her medical notes, Dr. Rashid had also expressed concern over plaintiff's

21 noncompliance with medication prescribed by herself and Dr. Keech for hypertension, and her

22 drug seeking behavior. (AR 24-25, 942, 944, 946, 948, 956, 960.)

01    Dr. Smith was plaintiff's primary care physician for seven months from August 2004 to

02    April 2005.   On January 14, 2005, Dr. Smith completed a DSHS Physical Evaluation in which

03    she opined that plaintiff's chronic migraine headaches were severe, her labile hypertension was

04    marked, and her depression was mild.   (AR 980.)   On April 7, 2005, Dr. Smith noted that

05    plaintiff "once again denied any noncompliance with her medications; however, her recent

06    hospitalization during which she became quite hypotensive when on her prescribed medication

07    suggests otherwise."   (AR 25, 2500.)   In July 2004, Dr. Smith attempted to establish a patient

08    care agreement with plaintiff at the request of emergency room physicians, under which

09    plaintiff would not receive any narcotic pain medication.   (AR 24-25, 192, 781, 786.)   On

10    May 20, 2005, however, Dr. Smith terminated plaintiff's care after she missed numerous

11    appointments, stating "this is unacceptable."   (AR 2524, 2527, 2529.)

12        Dr. Powell was plaintiff's primary care physician for less than one year, beginning in

13    September 2005.   (AR 1079, 2691.)   On January 20, 2006, Dr. Powell completed a DSHS

14    Physical Evaluation in which she opined that plaintiff was limited to sedentary work due to

15    hypertension, headaches, and anxiety.   (AR 1078.)   In February 2006, Dr. Powell attempted

16    to establish a patient care agreement with plaintiff, under which plaintiff could no longer obtain

17    narcotic pain medication for her headaches at the University of Washington emergency room.

18    (AR 24, 2685-86, 2688, 2680 "I agree that it would be best to avoid medications for her

19    headaches and it would be very easy for us to do this.   However, she will then end up in

20    multiple clinics/ERs seeking medications.   This doesn't exactly solve the problem (only

21    ours).")

22        Plaintiff established care at Valley Family Medicine with primary care physician Dr.

01 Murray in April 2006. (Dkt. No. 20 at 10.) On August 14, 2006, Dr. Murray completed a

02 DSHS Physical Evaluation in which she opined that plaintiff was limited to "part-time

03 sedentary work" due to hypertension, chronic kidney disease, pelvic pain/dysfunctional uterine

04 bleeding, bipolar disorder/anxiety, and insomnia. (AR 1082.) Dr. Murray also noted that

05 plaintiff "is slowly improving her mood/psychological stability," and that "[s]he plans to

06 undergo surgery to try to relieve her pelvic pain," and,"[a]fter 12 months she may be stable

07 enough to obtain employment." (AR 1083.) The ALJ noted that on February 26, 2007, Dr.

08 Murray had "cleared the claimant to have procedures regarding anal stenosis and dysfunctional

09 uterine bleeding," noting that "claimant's impairments appeared to be under good control."

10 (AR 25.)

11      The ALJ gave these opinions "little weight," stating that "they are not consistent with

12 the objective medical evidence and the claimant's wide range of activities, and fail to consider

13 the consequences of failure to cooperate with and follow treatment, or the claimant's untoward

14 self-limiting and addictive behavior." (AR 26.) The ALJ further stated that plaintiff is not "a

15 credible individual," and "these opinions are predicated on the claimant's report of symptoms,

16 and thus the opinions are not credible." *Id.*

17      The ALJ provided specific and legitimate reasons for giving little weight to the DSHS

18 evaluations from Drs. Rashid, Smith, Powell, and Murray. As the ALJ repeatedly noted, the

19 conclusions of plaintiff's treating physicians regarding her limitations were inconsistent with

20 the objective medical evidence, including medical evidence from Drs. Rashid, Smith, Powell,

21 and Murray. In addition, the ALJ found that the evaluations did not account for plaintiff's

22 failure to comply with treatment recommendations or her drug seeking behavior, which were

01  well documented in the medical evidence.   When a treating physicians' conclusions are

02  inconsistent with the objective medical evidence in the record, or the limitations regarding a

03  claimants' ability reported by the treating physicians are not supported by objective medical

04  evidence, the ALJ is permitted to give these conclusions little or no weight.   In addition, "[a]

05  physician's opinion of disability 'premised to a large extent upon the claimant's own accounts

06  of his symptoms and limitations' may be disregarded where those complaints have been

07  'properly discounted.'"   *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir.

08  1999)(*quoting Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989)).   Here, the ALJ properly

09  found plaintiff not entirely credible.   (AR 24-25.)   Accordingly, the physicians' opinions,

10  based to a large extent on plaintiff's self reports of her symptoms and limitations, were properly

11  disregarded by the ALJ.

12       Further, the ALJ gave significant weight to the state agency medical consultant Dr.

13  Merrill, who reviewed all of the evidence in the "dense" file and opined that plaintiff "retains

14  the capacity for light work."   (AR 26, 180-87.)   The ALJ found Dr. Merrill's opinion

15  consistent with objective medical evidence.   The opinion of a state agency medical consultant

16  can amount to substantial evidence as long as it is supported by other evidence in the record,

17  such as the opinions of other examining and consulting physicians, which are in turn based on

18  independent clinical findings.   *See Andrews*, 53 F.3d at 1041.

19       In addition, the ALJ relied on the opinion of testifying medical expert Dr. Nielsen.

20  Based on his review of the medical evidence, Dr. Nielsen opined that there was no "objective

21  medical evidence that would keep her – physically, that would prevent her from working."

22  (AR 3050-51.)   The opinions of Dr. Nielsen and Dr. Merrill are consistent with the plaintiff's

01   medical evidence, plaintiff's admitted activities, and the opinion of plaintiff's treating

02   physician, Dr. Keech.   Accordingly, the Court finds that substantial evidence supports the

03   ALJ's decision to give little weight to the DSHS opinions of Drs. Rashid, Smith, Powell, and

04   Murray.[3]

05          3.   *William R. Wilkinson, Ed.D; Mark Sullivan, M.D., Ph.D.; Sarah*
              *Tremblay, M.A., Teofilo Ramirez, MSW, MHP; and Marianne Kampf,*
06            *ARNP*

07          Plaintiff also asserts that the ALJ improperly rejected the opinion of examining

08   psychologist William R. Wilkinson, Ed.D.; treating psychiatrist Mark Sullivan, M.D., Ph.D.;

09   mental health counselors Sarah Tremblay, M.A., and Teofilo Ramirez, MSW, MHP; and nurse

10   practitioner Marianne Kampf, ARNP.   The Commissioner disagrees, and insists that the ALJ's

11   reasons for rejecting their opinions were sufficiently legitimate.   (Dkt. No. 24 at 17-19.)

12          On February 3, 2005, Dr. Wilkinson performed a psychological examination of

13   plaintiff, administered psychological tests, and prepared a psychological evaluation.   (AR

14   968-76.)   He diagnosed plaintiff with major depression, recurrent, PTSD, anxiety, and panic

15   disorder, with a GAF score of 43.   (AR 27, 969.)   He opined that plaintiff had mild to marked

16   symptoms with mild to marked functional limitations, including: marked limitations in her

17   ability to understand, remember, and follow complex instructions, and learn new tasks; and

18   marked limitations in her ability to relate appropriately to co-workers and supervisors, and

19          3 Plaintiff argues that Dr. Merrill's August 2005 opinion was "outdated" and that he
20   "did not consider hundreds of pages of records." (Dkt. 20 at 14.)   However, the decision to
     purchase a consultative examination is within the discretion of the ALJ.   *See* 20 C.F.R. §§
21   404.1519, 416.919.   A consultative examination is not necessary where medical evidence is
     readily available from the records of a claimant's medical sources.   *See* 20 C.F.R. §§
22   404.1519(a), 416.919(a).   Here, an additional consultative examination was not necessary as
     the record was sufficiently developed for the ALJ to make an informed decision.

01 respond appropriately to and tolerate the pressures and expectations of a normal work setting.

02 (AR 968-76.)

03    Dr. Sullivan was plaintiff's treating psychiatrist in 2005.   (AR 2508-09, 2570-72,

04 2642-44.)   On January 10, 2006, Dr. Sullivan completed a DSHS Psychological/Psychiatric

05 Evaluation, diagnosing her with post traumatic stress disorder, panic disorder, and major

06 depression.   (AR 1073.)   He opined that plaintiff had mild to marked symptoms, with mild to

07 marked functional limitations; including: marked limitations in her ability to exercise judgment

08 and make decisions, marked limitations in her ability to respond appropriately to and tolerate

09 the pressure and expectations of a normal work setting, and marked limitations in her ability to

10 control physical or motor movements and maintain appropriate behavior.   (AR 1074.)   He

11 noted that plaintiff's attendance and compliance with treatment was "variable."   (AR 1075.)

12    In May 2006, plaintiff began treatment at Seattle Mental Health with Sarah Tremblay,

13 B.A., and Teofilo Ramirez, MSW, MHP.   (AR 1085-88.)   On August 14, 2006, Ms. Tremblay

14 and Mr. Ramirez completed a DSHS Psychological/Psychiatric Evaluation, in which they

15 diagnosed plaintiff with major depressive disorder, single episode, severe; and cannabis abuse.

16 (AR 1086.)   They opined that plaintiff had mild to severe symptoms with moderate to marked

17 functional limitations, including: marked limitations in her ability to understand, remember and

18 follow complex instructions; learn new tasks; exercise judgment and make decisions; respond

19 appropriately to and tolerate the pressure and expectations of a normal work setting; and control

20 physical or motor movements and maintain appropriate behavior.   (AR 1087.)   They noted

21 that plaintiff's cannabis use exacerbated her symptoms.   *Id.*   On August 7, 2007, Marianne

22 Kampf, ARNP, a nurse practitioner at Seattle Mental Health, completed a DSHS

01 Psychological/Psychiatric Evaluation, opining that plaintiff had marked to severe symptoms of

02 major depressive disorder, single episode, severe with psychotic features.   (AR 1135-38.)

03 She found that plaintiff had moderate to severe functional limitations.   (AR 1137.)

04       The ALJ gave "little weight" to the evaluations of Drs. Wilkinson and Sullivan, and the

05 providers at Seattle Mental Health, finding that they were inconsistent with the objective

06 medical evidence, consisted of only check-off boxes rather than a detailed evaluation, and were

07 based on plaintiff's unreliable self reports, which the ALJ properly found not credible.   (AR

08 27.)

09       Further, the ALJ assigned significant weight to the opinions of examining psychologist

10 George Ankuta, Ph.D., and state agency medical consultant Gary Nelson, Ph.D.   (AR 26-27,

11 154-71, 1064-66.)   On April 15, 2004, Dr. Ankuta performed a psychological evaluation of

12 plaintiff and prepared a written report, diagnosing her with adjustment disorder with depression

13 and anxiety.   (AR 1065-66.)   He assigned her a GAF Score of 54.   (AR 1066.)   He noted that

14 plaintiff has friends who she sees three to four times a week, likes to bowl twice a month, likes

15 to fish three to four times in the summer, likes to gamble (though she has not done it for two

16 years), likes to listen to music, and likes to sew (but cannot because her hand tends to spasm).

17 He found:

18         She has a fair to poor fund of knowledge.   She had limited ability to think
        abstractly.   Her memory was fair to poor and she could have difficulty recalling
19         even simple instructions at work.   She recalled none of three words at five
        minutes, but she recalled four digits forward and backward.   She might be able
20         to work with special supervision.   Her attention and concentration were good.
        She is polite and socially appropriate so she could relate socially appropriately at
21         work.   She is emotionally stressed by her health and family problems.

22

01 (AR 1066.)[4]

02 On May 6, 2004, Dr. Nelson completed a Psychiatric Review Technique form and

03 prepared a Mental Residual Functional Capacity Assessment. (AR 154-71.) Based on his

04 review of the record, Dr. Nelson determined that although plaintiff has some difficulty with

05 multi-step tasks, she retains the ability to perform one or two step tasks. (AR 170-71.) He

06 found no other limitations. (AR 171.) The ALJ gave the opinions of Drs. Ankuta and Nelson

07 significant weight, finding them consistent with the objective medical evidence and the

08 plaintiff's wide range of activities.

09 "The trier of fact and not the reviewing court must resolve conflicts in the evidence, and

10 if the evidence can support either outcome, the court may not substitute its judgment for that of

11 the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). The

12 Court finds that substantial evidence supports the ALJ's decision to give little weight to the

13 evaluations of Drs. Wilkinson and Sullivan, and the providers at Seattle Mental Health.

14 "A physician's opinion of disability 'premised to a large extent upon the claimant's own

15 accounts of his symptoms and limitations' may be disregarded where those complaints have

16 been 'properly discounted.'" *Morgan*, 169 F.3d at 602. Here, the ALJ properly found

17 plaintiff not entirely credible. (AR 24-25.) Accordingly, opinions based to a large extent on

18 plaintiff's self reports of her symptoms and limitations were properly disregarded by the ALJ.

19 _____

20 4 Plaintiff argues that Dr. Ankuta concluded she would only be able to work in a "sheltered workshop," which would preclude Plaintiff from performing any work in the national economy at step five." (Dkt. 20 at 14.) A "sheltered workshop" is an organization that provides training and employment for severely impaired individuals. See 20 C.F.R. § 404.1574 (describing a "sheltered workshop" as a facility set up for severely impaired individuals). Plaintiff misstates Dr. Ankuta's opinion. Contrary to plaintiff's assertion, Dr. Ankuta did not limit her to a "sheltered workshop," but rather opined that her memory was poor, but that "[s]he might be able to work with special supervision." (AR 1066.) In fact, Dr. Ankuta determined that plaintiff's GAF score was 54, indicating only moderate symptoms or moderate difficulty in social or occupational functioning.

In addition, opinions rendered on check-box or form reports that do not contain significant explanation of the bases for conclusions may appropriately be accorded little or no weight. *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *Murray v. Heckler*, 722 F.2d 499, 501 (9th Cir.1983). The evaluation forms contain little information regarding the basis for the limitations they assessed. Thus, the basis for their opinions is not clear, and the ALJ reasonably considered the check-box format in assigning little weight to their opinions.

F. Medical-Vocational Guidelines

Plaintiff argues that the ALJ erred by failing to hear testimony from a Vocational Expert ("VE") at step five of the sequential evaluation process despite the presence of significant non-exertional impairments. (Dkt. No. 20 at 22-23.) The Commissioner responds that the ALJ was not required to call a VE and was permitted to rely on the framework of the Medical-Vocational Guidelines ("Guidelines") because he properly found plaintiff capable of performing substantially all of the unskilled work contemplated by the Guidelines. (Dkt. No 24 at 20-21.)

When a claimant has established she suffers from a severe impairment that prevents her from performing any work she has done in the past, she has made a *prima facie* showing of disability. "At this point – step five – the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100 (citing 20 C.F.R. § 404.1560(b)(3)). The Commissioner can meet this burden in one of two ways: (a) by the testimony of a vocational expert, or (b) by reference to the Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.

01         An ALJ may utilize the Guidelines when they "completely and accurately represent a

02    claimant's limitations, such that a claimant is able to perform the full range of jobs in a given

03    category." *Tackett*, 180 F.3d at 1102. "When a claimant's nonexertional limitations are

04    'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's

05    exertional limitations, the grids are inapplicable . . . In such instances, the Secretary must take

06    the testimony of a vocational expert and identify specific jobs within the claimant's

07    capabilities." *Burkhart*, 856 F.2d at 1340 (*quoting Desrosiers v. Sec'y of Health & Human*

08    *Serv.*, 846 F.2d 573, 577 (9th Cir. 1988)).

09         Here, the ALJ found that there were jobs that exist in significant numbers in the national

10    economy that plaintiff could perform and that her mental limitations to simple, repetitive work

11    did not significantly erode the occupational base of light, unskilled work. (AR 28-30.)

12    Plaintiff argues that the evidence supports a finding that she had significant non-exertional

13    limitations, citing to the opinions of plaintiff's treating physicians, discussed above, who

14    limited plaintiff to sedentary work. (Dkt. No. 20 at 22.) The Court disagrees.

15         In this case, the ALJ properly set forth a lengthy analysis of the factors weighed in

16    considering plaintiff's RFC, including plaintiff's complaints, lay witness statements from

17    plaintiff's daughter, physicians' opinions, and other evidence in the record. (AR 23-27.) The

18    ALJ then considered whether plaintiff's non-exertional impairments would significantly limit

19    her ability to perform unskilled work. The ALJ found that it would not, stating:

20               Unskilled jobs at all levels of exertion constitute the potential occupational base
                 for persons who can meet the mental demands of unskilled work. These jobs

21               ordinarily involve dealing primarily with objects, rather than with data or
                 people, and they generally provide substantial vocational opportunity for

22               persons with solely mental impairments who retain the capacity to meet the

intellectual and emotional demands of such jobs on a sustained basis. . . . The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine setting. . . . I conclude that with the mental limitations denoted above, consistent with Hoopai and Ortiz, the claimant retains the capacity to perform unskilled work as explicated by Social Security Ruling 85-15. I have also found the claimant to retain the residual functional capacity to perform work at the light level of demand.

(AR 29.)

Upon review, the Court finds that substantial evidence supports the ALJ's conclusion that plaintiff's non-exertional limitations were not sufficiently severe such that they significantly effected her ability to work. As discussed above, the ALJ properly relied on the opinions of Drs. Ankuta and Nelson, who concluded that plaintiff had only mild to moderate limitations. Accordingly, the Court finds no error at this step of the ALJ's decision.[5]

V.    CONCLUSION

For the reasons set forth above, the Court recommends that the decision of the Commissioner be affirmed. A proposed order accompanies this Report and Recommendation.

DATED this <u>24th</u> day of September, 2009.

Mary Alice Theiler
United States Magistrate Judge

---

[5] Plaintiff also argues that the Guidelines support a finding of disability as of her 50th birthday in January, 2008, because she was limited to sedentary work. (Dkt. 20 at 23.) The Commissioner responds that plaintiff's argument is "specious," as she retains the ability to perform unskilled, light work. (Dkt. 24 at 20.) The Commissioner is correct. Although individuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work, the ALJ here properly found that plaintiff could perform unskilled, light work. 20 C.F.R. Pt. 404, Subpt. P., App. 2, Rule 201.14. Accordingly, the Court rejects plaintiff's argument.